JUDGE KOELTL          07 CV 6073

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

BAYERISCHE HYPO-UND VEREINSBANK AG,
NEW YORK BRANCH                                    :

                    Plaintiff,                     :        Case No.    **07 CV 6073(JGK) - ECF CASE**
                                                           _____
                                                   :

        -against-                                  :

WACHOVIA BANK, N.A., f/k/a/ FIRST UNION            :        **NOTICE OF REMOVAL**
NATIONAL BANK, as Trustee of HEILIG-
MYERS MASTER TRUST,                                :

                                                   :                    JUN 2 7 2007
                    Defendant.                     :

-------------------------------------------------------------x

NOW COMES defendant Wachovia Bank, N.A. ("Wachovia"), and pursuant to 28

U.S.C. § 1446(a) herewith gives notice of its removal of this action from the Supreme Court of

the State of New York, County of New York, to the United States District Court for the Southern

District of New York, and in support thereof shows to the Court as follows:

    1.      This action was begun by the plaintiff June 4, 2007 by the filing of a complaint,

Index No. 07-601843, in the Supreme Court of the State of New York, County of New York,

seeking declaratory relief and claiming breach of contract against the defendant.  Pursuant to

Local Civil Rule 81.1(b) for the Southern District of New York, copies of the complaint and

summons are attached hereto as Exhibit 1.

    2.      The summons and complaint were accepted by Wachovia on June 18, 2006.   A

copy of the statement of service and acknowledgment of receipt form signed by counsel for

Wachovia is attached hereto as Exhibit 2.

    3.      Other than the filing and service of a copy of the Complaint, no other actions have

taken place in the state court proceeding.

4.      This court has original jurisdiction over the subject matter of the plaintiff's complaint under 28 U.S.C. §§ 1332 and 1348, in that (a) plaintiff and defendant are citizens of different States, or (b) plaintiff is a citizen or subject of a foreign state and defendant is a citizen of a State, and (c) the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

5.      As required by Local Civil Rule 81.1(a)(2), the state of incorporation and principal place of business of each party are as follows:

    a.  Defendant Wachovia is a federally chartered bank with its principal place of business in Charlotte, North Carolina.   The state listed on Wachovia's organization certificate is North Carolina.

    b.  Plaintiff Bayerische Hypo-Und Vereinsbank AG, New York Branch alleges it is a branch of Bayerische Hypo-Und Vereinsbank AG, a bank organized and existing under the laws of the Republic of Germany with its principal office in New York, New York. *See* Complaint, ¶ 7.

6.      Accordingly, this action is removable pursuant to 28 U.S.C. § 1441(a).   *See generally Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303 (2006).

7.      As required by 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being filed with the Clerk of the Supreme Court of the State of New York, County of New York.

WHEREFORE, defendant prays that all further proceedings in this action be conducted in the United States District Court for the Southern District of New York.

#972759_1.DOC

This the 27 day of June, 2007.

SMITH, ANDERSON, BLOUNT, DORSETT,
MITCHELL & JERNIGAN, L.L.P.

By: _____
James M. Parrott, V.
S.D.N.Y. Bar No. 589387
P. O. Box 2611
Raleigh, North Carolina 27602
Telephone (919) 821-1220
Facsimile (919) 821-6800

*Attorney for Defendant*
Wachovia National Bank, N.A.

OF COUNSEL:

SMITH, ANDERSON, BLOUNT, DORSETT,
  MITCHELL & JERNIGAN, L.L.P.
Carl N. Patterson, Jr., Esq.
N. C. State Bar No. 7260
Donald H. Tucker, Esq.
N.C. State Bar No. 12578
P. O. Box 2611
Raleigh, North Carolina 27602
Telephone (919) 821-1220
Facsimile (919) 821-6800

3

#972759_1.DOC

<u>CERTIFICATE OF SERVICE</u>

This is to certify that the undersigned has this date served the foregoing document in the above-titled action upon all parties to this cause by depositing a copy thereof, postage paid, in the United States mail, and also upon the Clerk of the Supreme Court of the State of New York, County of New York, by hand delivery, addressed to the attorneys for said party and to the Clerk as follows:

> Mark J. Hyland
> Jeffrey M. Dine
> Seward & Kissel, LLP
> One Battery Park Plaza
> New York, New York 10004
>
> County Clerk for the Supreme Court of New York
> New York County
> 60 Centre Street, Room 119
> New York, New York 10007

This the 27 day of June, 2007.

_____
James M. Parrott, V.

## **EXHIBIT 1**

Index No.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

BAYERISCHE HYPO- UND
VEREINSBANK AG, NEW YORK
BRANCH,

Plaintiff,

-against-

WACHOVIA BANK, N.A., f/k/a FIRST
UNION NATIONAL BANK, as Trustee
of HEILIG-MEYERS MASTER TRUST,

Defendant.

COMPLAINT

SEWARD & KISSEL LLP

Attorneys for Plaintiff

One Battery Park Plaza
New York, New York 10004
(212) 574-1200

B199— Summons without notice, Supreme Court.

©1993 Blumberg Excelsior, Inc., Publisher, NYC 10013
www.blumberg.com

# Supreme Court of the State of New York
## County of NEW YORK

BAYERISCHE HYPO–UND VEREINSBANK AG, NEW YORK BRANCH

Plaintiff(s)

against

WACHOVIA BANK, N.A., f/k/a FIRST UNION NATIONAL BANK, as Trustees of HEILIG-MEYERS MASTER TRUST,

Defendant(s)

Index No. 601843/2007
Date purchased   June 4, 2007

Plaintiff(s) designate(s)   NEW YORK

County as the place of trial.

The basis of the venue is
CPLR 503(a) and (c)

## Summons

Plaintiff(s) reside(s) at
150 E. 42nd Street – #32 Fl.
New York, New York 10017
County of
New York

To the above named Defendant(s)

**You are hereby summoned** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's Attorney(s) within   20   days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated,   New York, New York
June 4, 2007

Mark J. Hyland

Attorney(s) for Plaintiff

Office and Post Office Address
Mark J. Hyland, Esq.
Jeffrey M. Dine, Esq.
Seward & Kissel, LLP
One Battery Park Plaza
New York, New York 10004

Defendant's address:

Wachovia Corporation
301 South College Street
Suite 4000
One Wachovia Center
Charlotte, North Carolina 28288-0013

NEW YORK COUNTY CLERK'S OFFICE
JUN 4 2007
NOT COMPARED WITH COPY FILE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

BAYERISCHE HYPO- UND VEREINSBANK AG,
NEW YORK BRANCH,

Index No. 601843/2007

                                        Plaintiff,

        -against-.

**COMPLAINT**

WACHOVIA BANK, N.A., f/k/a FIRST UNION
NATIONAL BANK, as Trustee of HEILIG-
MEYERS MASTER TRUST,

                                        Defendant.

---

Plaintiff Bayerische Hypo- und Vereinsbank AG, New York Branch ("HVB"), by

its attorneys, Seward & Kissel LLP, allege of the Defendant as follows:

### Nature of Action

1.      This is an action for declaratory judgment pursuant to CPLR 3001 and for

breach of contract.  HVB seeks a declaration of the parties' rights under certain agreements.

HVB, a foreign bank, is a creditor of the Heilig-Meyers Master Trust (the "Trust").  Defendant

Wachovia Bank. N.A. ("Wachovia" or the "Trustee") is the Trustee of the Trust.  The Trust is

holding approximately $1.16 million received in settlement of the Trust's Bankruptcy

Administrative Claim (the "Administrative Claim") in the bankruptcy of Heilig-Meyers

Company (and various affiliated entities) and anticipates receiving in the future some $8 million,

and possibly significantly more, in settlement of its Bankruptcy General Unsecured Claim (the

"Unsecured Claim").  These monies are the subject of this action (collectively, the "Contested

Funds").  HVB claims that it is entitled to the bulk of the Contested Funds, while the Trustee

claims that competing creditors are entitled to the largest part of the Contested Funds.

2.      As set forth more fully below, this action is a consequence of the filing of

a petition in bankruptcy on August 16, 2000 by Heilig-Meyers Company, a manufacturer of

household furniture, and subsidiaries thereof, which are not parties herein. According to the Trustee, the Contested Funds "relate to claims that existed and relate back to the day before Heilig-Meyers' bankruptcy, August 15, 2000." Notice to Certificateholders Heilig-Meyers Master Trust dated March 5, 2007 (the "March 5, 2007 Notice"), at 4, attached hereto as Exhibit 1 and incorporated herein by reference.

3.    As set forth more fully below, the Trust issued certificates, or notes, to investors and the payment of such certificates was secured by the payments deposited into the Trust from Heilig-Meyers Company customers paying for their furniture under the installment contracts.

4.    Under the documents governing the Trust, the Contested Funds are required to be deposited in the Trust's Collection Account (defined below) as the result of a contractual provision negotiated by HVB for its sole benefit. That contractual provision states that if the debt rating for Heilig-Meyers Company were downgraded, then monies collected thereafter by the Servicer (then Heilig-Meyers Company) on behalf of the Trust would be segregated in the Collection Account maintained by the Trustee and not retained by Heilig-Meyers Company. Heilig-Meyers Company's debt rating (and that of a specified affiliate) was downgraded on August 1, 2000, 16 days before Heilig-Meyers Company filed for bankruptcy and prior to the Administrative Claim and Unsecured Claim accruing.

5.    Based on statements by the Trustee, the Trustee's position is that the vast bulk of the Contested Funds should be paid to the holders of the other classes of Certificates. March 5, 2007 Notice at 6.[1] Because the Trust consists of impaired value assets which will not satisfy the Trust's obligations, on information and belief there will be no substitute source of

---

[1]    HVB, as Collateral Indebtedness Holder for the 1998-1 and 1998-2 Series of the Trust, does not claim an interest in monies allocated to the Trust Series 1997-1.

payment to HVB from the Trust should Wachovia pay the Contested Funds over to the Class A Certificateholders and Class B Certificateholders of the 1998-1 and 1998-2 Series.

6.      Moreover, if the Trustee wrongfully pays the Contested Funds to the Class A Certificateholders and Class B Certificateholders, Wachovia may assert that it would be absolved from liability under a provision in the Trust documents that shields it from liability unless the payment amounts to negligence or willful misconduct or results from a decision not made in good faith. Because there are multiple Class A Certificateholders and Class B Certificateholders, it may be very difficult, if not impossible, to retrieve a payment mistakenly made to them. Thus, if the Contested Funds are paid out, HVB may be deprived of any remedy. Accordingly, HVB seeks a declaration of the parties' rights.

## The Parties

7.      HVB is a New York State-licensed branch of Bayerische Hypo- und Vereinsbank AG, a bank organized and existing under the laws of the Republic of Germany. HVB has its principal office in New York, New York.

8.      Wachovia is a federally chartered national banking association. Wachovia has offices within the State of New York and is doing business in New York. Wachovia serves as Trustee of the Trust under a Master Pooling and Servicing Agreement, which, together with other documents described below, governs disbursement of the Contested Funds. Wachovia succeeded First Union National Bank as Trustee after Wachovia purchased First Union in about 2001.

9.      On information and belief, Wachovia or an affiliate is a holder of more than 45% of the Class A and Class B certificates of Series 1998-1 and 1998-2 of the Trust.

10.     As set forth more fully in paragraphs 39 - 41 below, this action is related to an earlier case in this Court, and concerns similar issues of contract interpretation.

## Background

11.    Heilig-Meyers Company was a retailer, selling household furniture to the public. Prior to Heilig-Meyers Company filing a petition in bankruptcy, its customers were able to purchase furniture from its stores on an installment contract basis, paying the purchase price over time. Heilig-Meyers Furniture financed substantially all of its installment sales contracts through the Trust and retained servicing rights.

12.    The Trust was formed in 1997 in connection with a program providing for the issuance of asset-backed securities. The Trust sold securities, called certificates, which were backed by the income stream generated by the installment sale contracts ("Contracts") that customers were obligated to pay.

13.    Pursuant to this program, Heilig-Meyers Furniture sold a large portion of the installment sales contracts that it originated ("Contracts") to an affiliate, non-party MacSaver Funding Corporation (the "Transferor"). The Contracts ultimately were assigned to the Trust and to the Trustee, for the benefit of the Certificateholders, including HVB. The installment sales contracts are assets of the Trust.

14.    According to the Trustee:

> The Contracts are assets of the Heilig-Meyers Master Trust. In essence, individual consumers enter into one or more Contracts to purchase furniture, among other things, on an installment basis with the credit department of the [Heilig-Meyers Company]'s retail furniture stores from which the purchases are made. The vast majority of these Contracts are bundled as a package and sold to the Transferor. The package consists of Contracts in existence as of the date of the Agreement, Contracts originated at the retail level any time thereafter, and those Contracts that are subsequently amended by existing consumer-debtors.

Amended Complaint, dated August 18, 2000, ¶ 11, *First Union National Bank v. Heilig-Meyers Co., No. 00-34533-DOT* (Bankr. E.D. Va.) ("Trustee Am. Compl.").

4

15.    Heilig-Meyers Co. was the Servicer of the Trust in August, 2000.

According to the Trustee, in August 2000:

> As Servicer of the Contracts under the Agreement, [Heilig-Meyer Company] facilitates the invoicing and collection of the more than one million installment payments made each month at the individual retail furniture stores on the Contracts by the consumer-debtors. [Heilig-Meyers Company] then processes and separates those payments, allocating the appropriate percentage to the [Trust], and is responsible for ensuring that the monies allocated to the [Trust] are then deposited in the appropriate accounts held by [the Trustee] in time for payment to the Certificateholders. . . .

Trustee Am. Compl. ¶ 13.

16.    The Trust had a continuing obligation to pay to Heilig-Meyers Company, monthly in arrears, the Monthly Servicing Fee defined in Section 3.2 of the Amended and Restated Master Pooling and Servicing Agreement dated as of February 23, 1998 (the "Pooling and Servicing Agreement") among MacSaver Funding Corporation (the "Transferor"), Heilig-Meyers Company and First Union on behalf of the Certificateholders of the Trust. The Monthly Servicing Fee was approximately $2.5 million per month.

17.    The Trust issued one series of asset-backed securities in 1997 and two series in 1998 (Series 1998-1 and Series 1998-2). Each of the 1998 Series included Class A Certificates, Class B Certificates and what is known as the Collateral Indebtedness Interest. HVB is the holder (by assignment) of the Collateral Indebtedness Interest (the "HVB Interest").

18.    HVB is a creditor of the Trust pursuant to the following agreements (i) the Pooling and Servicing Agreement; (ii) the Series 1998-1 Supplement, dated as of February 27, 1998, to the Pooling and Servicing Agreement (the "1998-1 Supplement") among the Transferor, Heilig-Meyers Company, as Servicer, and the Trustee; (iii) the Series 1998-2 Supplement, dated as of August 27, 1998, to the Pooling and Servicing Agreement (the "1998-2 Supplement" and, together with the 1998-1 Supplement, the "1998 Supplements") among the Transferor, the

5

Servicer and the Trustee; (iv) the Loan Agreement, dated as of February 27, 1998 (the "1998-1 Loan Agreement"), relating to Series 1998-1, among the Trustee, Heilig-Meyers Company, as Servicer, the Transferor, the CA Investors named therein and HVB, as Agent; (v) the Loan Agreement, dated as of August 27, 1998 (the "1998-2 Loan Agreement" and, together with the 1998-1 Loan Agreement, the "Loan Agreements"), relating to Series 1998-2, among the Trustee, the Servicer, the Transferor, the CA Investors named therein and HVB, as Agent and (vi) Supplemental Spread Account Letters entered into in connection with the Loan Agreements.

**The Events of August, 2000**

19.    On August 16, 2000, Heilig-Meyers Company, Heilig-Meyers Furniture, and their affiliates filed a petition in bankruptcy pursuant to Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Petition"). Pursuant to Section 362 of the United States Bankruptcy Code, all actions against the debtors therein were automatically stayed.

20.    On August 1, 2000, approximately two weeks before the Bankruptcy Petition was filed, the rating agencies Standard & Poor's Ratings Services ("S&P") and Moody's Investors Service, Inc. ("Moody's") downgraded their respective ratings of Heilig-Meyers Company and MacSaver Financial Services. One consequence of those ratings downgrades under the Loan Agreements and the Spread Account Letters with HVB, to which the other Certificateholders were not parties, was that Principal Collections from the installment sales contracts that backed the securities issued by the Trust had to be placed in a specified collection account on a daily basis (the "Collection Account"). Thus, rather than the monies collected pursuant to the installment sales contracts being retained by or returned to bankruptcy debtor Heilig-Meyers Furniture or one of its bankruptcy debtor affiliates, the monies were deposited into the Collection Account and are not subject to the jurisdiction of the Bankruptcy Court. As

6

noted, HVB bargained for this provision, and it was for HVB's sole benefit to protect itself as a creditor.

21.    On or about August 10, 2000, Heilig-Meyers Company announced, through Paige Wilson, acting Chief Financial Officer and Treasurer, during a telephone conference call with representatives of the Trustee that it would stop performing its duties as a Servicer some time during the week of August 14, 2000. Trustee Am. Compl. ¶ 24.

22.    Ms. Wilson also announced Heilig-Meyers Company's intention to terminate the employment of its employees at the retail level who were responsible for extending credit to consumers and collecting the installment payments of consumer-debtors on existing Contracts. Trustee Am. Compl. ¶ 25.

23.    The circumstances under which Heilig-Meyers Company was permitted to resign as Servicer under Section 8.5 of the Pooling and Servicing Agreement were limited and were inapplicable to the circumstances of August, 2000. Trustee Am. Compl. ¶ 20.

24.    Heilig-Meyers Company's massive termination would have violated Section 8.5 of the Pooling and Servicing Agreement and rendered the performance of Heilig-Meyers' Company's obligations under the Pooling and Servicing Agreement as Servicer impossible. Trustee Am. Compl. ¶ 25.

25.    At the time, Heilig-Meyers Company was unwilling to discuss alternatives suggested by the Trustee to the planned cessation of the Company's performance of its duties under the Pooling and Servicing Agreement. Trustee Am. Compl. ¶ 26.

26.    On information and belief, on or about August 10, 2000, Heilig-Meyers Company refused to mail customer billings prepared and scheduled to be sent out on that date.

7

27.    Heilig-Meyers Company's actions constituted a repudiation of the Pooling and Servicing Agreement. As the Trustee told the Bankruptcy Court on August 16, 2000: "The Debtor *recently repudiated its contractual obligations* as Servicer and stated its intention to terminate hundreds of employees who collect the money due under the Contracts." Memorandum in Support of Motion for Temporary Restraining Order and Preliminary Injunction, dated August 16, 2000, at 3, *First Union National Bank v. Heilig-Meyers Co.*, No. 00-34533-DOT (Bankr. E.D. Va.) (emphasis added).

**The Collected Funds Were Received With Respect To The August 2000 Revolving Period**

28.    The period August 1-16, 2000 was part of the "Revolving Period" under the relevant Trust documents.

29.    The filing of the Bankruptcy Petition constituted an Early Amortization Event under Section 9.1(a) of the Pooling and Servicing Agreement. As a result of that filing, the Early Amortization Period under the 1998 Supplements commenced. During an Early Amortization Period, the governing documents provide for different rights among the parties.

30.    The Collection Period for the installment sales contracts for the month of August, 2000 was properly bifurcated into separate periods, one covering the period August 1 through August 16 (the date the Bankruptcy Petition was filed) and constituting part of the Revolving Period -- and the other covering the period August 17 through August 31 and constituting part of the Early Amortization Period.

31.    The Trustee concedes that the Administrative Claim and the Unsecured Claim existed and relate to the day before Heilig-Meyers Company's bankruptcy, and that "[p]rior to the bankruptcy, the Trust operated in a revolving period pursuant to the Trust documents." March 5, 2007 Notice at 4. That is, "these bankruptcy claims relate to pre-petition recoveries, and before the occurrence of an early amortization event." *Id.*

8

32.    In the alternative, Heilig-Meyers' repudiation of its obligations under the Pooling and Servicing Agreement on August 10, 2000 constituted a total breach of the Agreement. That breach gave the Trust and Trustee a matured claim for damages under the Pooling and Servicing Agreement on that date. According to the Trustee, amounts received in settlement of the Unsecured Claim are based on damages suffered by the Trust as the result of Heilig-Meyers Company's rejection of its obligations as Servicer of the Trust. March 5, 2007 Notice at 2. As a result, distributions made on the settlement of the Unsecured Claim are with respect to a Revolving Period, in that they relate to the Trust's matured damage claim during that period, and should be distributed in accordance with the provisions of the governing documents that concern such distribution.

33.    Section 4.2 of each of the 1998 Supplements provides that funds in the Collection Account "*with respect to* a Collection Period" shall be allocated to each Series in proportion to its size relative to the entire Trust. Within each Series, the Series' share of the Collection Account with respect to the Collection Period is to be allocated as set forth in Article IV of the relevant Supplement. As a result, funds need not be received *during* a particular Collection Period to be allocated and distributed "*with respect to*" such Collection Period.

34.    Section 4.6(e) of each of the 1998 Supplements sets forth the mechanism for distributing on each Distribution Date the monies collected by the Trust under the installment sales contracts with respect to each Collection Period (i.e., the month prior to the month in which the Distribution Date occurs) with respect to the Revolving Period (in this case August 1 to August 16, 2000). Section 4.6(e) of the 1998 Supplements provides as follows:

> On each Distribution Date with respect to the Revolving Period, all Available Principal Collections shall be applied in the following priority:

(i)      an amount equal to Collateral Monthly Principal for such Distribution Date shall be applied in accordance with the Loan Agreement;

(ii)     an amount other than Collateral Monthly Principal for such Distribution Date to be applied in accordance with the Loan Agreement; and

(iii)    an amount equal to Class D Monthly Principal for such Distribution Date shall be distributed to the Paying Agent for payment to the Class D Certificateholders; and

(iv)     the balance, if any, shall be treated as "Excess Principal Collections" with respect to other Series in Group One to be applied in accordance with Section 4.1(e) (and be retained in the Excess Funding Account if required by such provision).

35.      Principal Collections, as relevant here, are defined as all payments received in respect of the Trust's contracts that are not received in respect of finance charges. The amounts received by the Trust in respect of the Administrative Claim and the Unsecured Claim constitute Principal Collections.

36.      Section 4.6(e)(i) has no application because Collateral Monthly Principal would either be zero under the applicable formula or, to the extent that the payment would be considered to be made during the Revolving Period, would be paid only if the Transferor (a Heilig-Meyers affiliate) shall have elected to pay such amount, which it did not.  The Loan Agreements referenced in Section 4.6(e) above are the Loan Agreements among HVB, First Union, Heilig-Meyers Company and one of its affiliates, and the CA Investor named therein (which was a special purpose financing conduit administered by HVB, from which HVB acquired the HVB Interest by assignment).  The Class A Certificateholders and Class B Certificateholders are not parties to the Loan Agreements.

37.      Section 2.10 of each of the Loan Agreements referenced in Section 4.6(e)(ii) of the 1998 Supplements sets forth the application and distribution mechanism with respect to what are referred to as "Available Principal Funds" and "Available Non-Principal

Funds". By reason of Heilig-Meyers Company being downgraded by S&P as of August 1, 2000,

a Non-Reduction Event under Section 2 of the Spread Account Letters occurred. That meant that

the Principal Collections set aside with respect to the month of August 2000 (now including the

Contested Funds) were to be treated as "Available Non-Principal Funds" and were to fund what

are known as Spread Accounts for the benefit of HVB. Section 4.6(e)(iv) mandates the same

result by providing that Available Principal Collections remaining after application of the funds

as provided in Section 4.6(e)(i)-(iii) be treated as Excess Principal Collections and applied in

accordance with Section 2.10(a) of the Loan Agreements, thus resulting in the funding of the

Spread Accounts for the benefit of HVB.

48. Aside from the support for the payment of the Contested Funds to HVB

found in the above-referenced provisions, the funding of the HVB Spread Accounts with

Principal Collections received during (or attributed to) the August Revolving Period (here

constituting the Contested Funds) is, as noted above, supported by the fact that Principal

Collections during the period August 1 through August 16 would not have been deposited into

the Collection Account but for the provisions of the Loan Agreements and the Spread Account

Letters, which required that Principal Collections be deposited into the Collection Account on a

daily basis following the August 1, 2000 downgrades of Heilig-Meyers Company. In the

absence of such provisions, the Principal Collections for August 2000 would have been retained

by Heilig-Meyers Company or one of its affiliates, each a debtor in bankruptcy, and thus lost to

the Trust.

**The Prior Litigation**

39. In the Spring of 2001, in light of the prior Trustee's decision at that time to

distribute funds without taking into account the terms of the governing agreements outlined

above, HVB brought suit in New York State Supreme Court, New York County (*Bayerische*

11

*Hypo- und Vereinsbank AG, New York Branch v. First Union Nat'l Bank*, Index No. 601223/01

(Gammerman, J.)) to enjoin the Trustee's then-planned distribution. In granting HVB's motion

for a preliminary injunction, the state court found that HVB had "shown a sufficient likelihood of

success on the merits" of its claim to justify enjoining the Trustee's planned distribution. A copy

of the state court's decision granting the injunction, filed April 26, 2001, is attached hereto as

Exhibit 2.

        40.    That litigation proceeded to discovery. Discovery showed, among other

things, that the Trust had applied Principal Collections in a manner consistent with HVB's

interpretation of the Trust documents to fund the Spread Accounts for HVB during a previous

Non-Reduction Event, and that Heilig-Meyers Company's Chief Financial Officer agreed that

the application of Principal Collections to fund HVB's Spread Accounts was correct both during

the previous Non-Reduction Event and in the August 1-16, 2001 period.

        41.    The prior litigation was resolved pursuant to a Settlement Agreement

dated October 18, 2002, "so ordered" by Justice Gammerman.

**The Current Dispute**

        42.    By the March 5, 2007 Notice, Wachovia stated its intention to distribute

the funds from the Administrative Claim (as well as certain other uncontested sources of funds)

on March 26, 2007. The March 5, 2007 Notice also set forth a hypothetical allocation assuming

an $8 million recovery on the Unsecured Claim. March 5, 2007 Notice at 6-7.

        43.    The Trustee stated in the March 5, 2007 Notice that the Administrative

Claim and the Unsecured Claims related to August 15, 2000 -- a "revolving period pursuant to

the Trust documents" -- and that the Claims were "pre-petition recoveries . . . before the

occurrence of an early amortization event." The Trustee nonetheless proposed to distribute the

funds "as if they had been distributed as of the last collection period prior to the bankruptcy, which ended in *July 2000*." March 5, 2007 Notice at 4 (emphasis added).

44.    The Trustee's decision had the effect of ignoring the Cap Increase Event and Non-Reduction Event that occurred under governing documents on August 1, 2000. Thus, rather than applying the Contested Funds to fund the Spread Accounts for the benefit of HVB, the bulk of the Contested Funds would be distributed to the Class A and B Certificateholders for the 98-1 and 98-2 Series of the Trust.

45.    By letter dated March 21, 2007, HVB informed the Trustee that it disputed the proposed distribution and allocation, stating HVB's belief that distributions from the Administrative and Unsecured Claims should be made to it. A copy of HVB's March 21, 2007 letter is attached hereto as Exhibit 3 and incorporated by reference.

46.    By letter dated March 23, 2007, the Trustee informed the holders of Trust Certificates that it would not make any distribution of the monies from the Administrative Claim on March 26. A copy of the Trustee's March 23, 2007 letter is attached hereto as Exhibit 4 and incorporated by reference.

47.    There is an actual dispute between the parties as to HVB's entitlement to the bulk of the Contested Funds.

48.    Under Article XI of the Pooling and Servicing Agreement, Wachovia, as Trustee, is exposed to liability in the event of negligence or willful misconduct; however, Article XI purports to protect the Trustee from incurring liability "for any action taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it" by the Pooling and Servicing Agreement or the supplements. In the event it pays the proceeds in the Collection Account to the Class A Certificateholders and

13

Class B Certificateholders, Wachovia may argue that it is shielded from liability. While HVB would dispute that Wachovia would be shielded from liability, the matter would be in issue. Furthermore, as discussed above, the Contested Funds might not be recoverable from the Class A Certificateholders and Class B Certificateholders.

49.    In view of the statements by the Trustee that it intends to pay the bulk of the Contested Funds to the Class A Certificateholders and Class B Certificateholders, contrary to HVB's rights under the documents governing its interest in the Trust, HVB requires declaratory relief in its favor.

### FIRST CAUSE OF ACTION
### (Declaratory Judgment)

50.    HVB repeats and realleges the allegations in paragraphs 1 - 49 as though fully set forth herein.

51.    HVB respectfully requests judgment pursuant to CPLR 3001 declaring that it is entitled to the Contested Funds, plus interest that has accrued thereon.

### SECOND CAUSE OF ACTION
### (Breach of Contract)

52.    HVB repeats and realleges the allegations in paragraphs 1 – 49 as though fully set forth herein.

53.    On or about March 26, 2007, the Trustee caused the Trust to make a distribution of funds of the Trust to Certificateholders.

54.    In breach of the requirements of the documents governing the Trust and Series 1998-1 and 1998-2, the Trustee should have, but did not, distribute funds resulting from the Bankruptcy Administrative Claim to HVB.

55.    HVB respectfully requests judgment awarding it damages in an amount to be determined at trial but in any event not less than $982,000, plus interest.

WHEREFORE, HVB respectfully requests judgment:

1.    Declaring the rights of the parties, including that HVB is entitled to the proceeds of the Administrative Claim and the Unsecured Claim attributable to Series 1998-1 and 1998-2 of the Trust, together with all interest thereon;

2.    Awarding it damages for the Trustee's breach of contract in an amount to be determined at trial but in any event not less than $982,000; and

3.    Awarding HVB its costs.

New York, New York
June 4, 2007

SEWARD & KISSEL LLP

By:  _Mark J. Hyland_
     Mark J. Hyland
     Jeffrey M. Dine
     One Battery Park Plaza
     New York, New York  10004
     (212) 574-1200

Attorneys For Plaintiff Bayerische Hypo- und
     Vereinsbank AG, New York Branch

SK 03161 0002 764902 v5

15

# **Exhibit 1**

**Wachovia Bank, National Association**
**As Trustee**
**123 S. Broad Street**
**Philadelphia, PA 19109**

### NOTICE TO CERTIFICATEHOLDERS
### HEILIG-MEYERS MASTER TRUST

**Collateral Indebtedness Interest, Series 1998-1**
**Collateral Indebtedness Interest, Series 1998-2**

---

Wachovia Bank, N.A., as Trustee of the Heilig-Meyers Master Trust, notifies the above Certificateholders of its plans with respect to the remaining Trust assets and about a proposal it has recently received with respect to the Trust certificates.

## BACKGROUND:

The Trustee has been in the process of liquidating the assets remaining in the Trust for the benefit of the Certificateholders. The only remaining assets are cash and a claim in the Heilig-Meyers bankruptcy proceeding. The cash remaining in the Trust has come from several sources at different times since the Heilig-Meyers bankruptcy filing in August 2000. Described below are the sources of those funds, which provide the basis for the Trustee's distribution plan.

## SOURCES OF FUNDS:

### Bankruptcy Administrative Claim

During the summer and fall of 2005, The Trustee settled two claims with the Heilig-Meyers bankruptcy estate. The first was an administrative claim to recover the proceeds of sales of accounts by the bankruptcy estates, which the Trustee claimed to be property of the Trust. As a result of the settlement with the bankruptcy estates, the Trustee recovered $1.1 million in cash. This account now has a balance of approximately $1.16 million.

### Bankruptcy General Unsecured Claim

In addition, the Trustee asserted on behalf of the Trust a general unsecured claim against the bankruptcy estates based on the damages suffered by the Trust as the result of Heilig-Meyers' rejection of its obligations as servicer of the Master Trust. As the result of the settlement of that claim, the Trust received an allowed general unsecured claim in the amount of $211,500,000. No distributions have yet been made by Heilig-Meyers on its general unsecured claims under its court approved plan. Those distributions may be made in either cash or stock in RoomStore (the only surviving entity from the Heilig-Meyers bankruptcy). It is unclear whether or when any distributions will be made or, if made, what amounts will be distributed. A highly speculative estimate, however, is that the Master Trust could receive approximately $8 million in cash or stock, or a combination thereof, as the result of this claim.

2

## Sale of Portfolio

As previously noticed, the Trustee arranged for the sale of the remaining portfolio of Heilig-Meyers' consumer loans. That sale was consummated in April 2006 with the result that the Trustee received, net of commissions, charge-backs, and expenses, approximately $6.28 million in cash.

## Class Action Reserve Fund

From November 2001 through February 2002, the Trustee reserved $2 million per month ($8 million in total) to fund the settlement of a South Carolina class action against Heilig-Meyers and the Trust and to pay related expenses. That action has now been settled and approximately $2.46 million remains in that fund.

## Main Collection Account

Collections from the Trust receivables were transferred into a main collections account, from which disbursements were made for Certificateholder distributions and Trust fees and expenses. Approximately $3.34 million remains in this account, less the amount the Trustee intends to reserve for final expenses, as described in detail, below.

3

## DISTRIBUTION METHODOLOGY:

Each source of funds was analyzed separately and each series and class of certificates received an amount equal to the funds it would have received, as if such amounts had been allocated through the waterfall described in the trust agreement when originally available. Applying this methodology results in the treatment described below.

### Bankruptcy Administrative Claim and Bankruptcy General Unsecured Claim

The funds received in settlement of the Bankruptcy Administrative Claim and any receipts arising out of the Bankruptcy General Unsecured Claim relate to claims that existed and relate back to the day before the Heilig-Meyers' bankruptcy, August 15, 2000. Prior to the bankruptcy, the Trust operated in a revolving period pursuant to the Trust documents. Because these bankruptcy claims relate to pre-petition recoveries, and before the occurrence of an early amortization event, the Trustee will distribute these funds as if they had been distributed as of the last collection period prior to the bankruptcy, which ended in July 2000.

### Sale of the Portfolio

The portfolio of accounts was sold in April 2006 generated approximately $6.28 million net to the Trust. This amount will be distributed to Certificateholders as if distributed in April 2006.

### Class Action Reserve

The Trustee will distribute the approximately $2.46 million remaining in this account as if it had been distributed during the time it was collected and reserved, November 2001 through February 2002.

### Main Collection Account

The Main Collection Account includes approximately $1.09 million in principal from collections not previously distributed. This amount will be distributed as if it were distributed during the April 2006 period, which is the last collection period prior to the sale of the portfolio.

The balance of funds in the Main Collection Account, approximately $2.25 million, is interest earned on money in the Main Collection Account from time-to-time from 2000 to 2006, .

5

The Trustee will distribute those funds based on when the interest was earned, less the amount the Trustee intends to reserve for final expenses, as described in detail, below.

## RESULTS OF APPLICATION OF METHODOLOGY

The results of the application of the methodology of the Trustee are set forth below.

### Summary of Distributions*

| Series/Class | Bankruptcy Administrative Claim | Estimated $8 Million Cash/Stock Bankruptcy General Unsecured Claim | Class Action Reserve | Portfolio Sale Proceeds | Main Collections Account | Main Collections Account Interest | Currently Available (w/o $8 million GUC) | Total Estimated/ Anticipated Distribution |
|---|---|---|---|---|---|---|---|---|
| 97-1 A1 | 90 | 623 | 191 | | | 139 | 420 | 1,043 |
| 97-1 A2 | 90 | 623 | 191 | | | 139 | 420 | 1,043 |
| 98-1 A | 425 | 2,916 | 1,144 | 3,043 | 526 | 912 | 6,050 | 8,966 |
| 98-1 B | 84 | 579 | 30 | 492 | 86 | 33 | 725 | 1,304 |
| 98-1 Collateral | 44 | 304 | | | | | 44 | 348 |
| 98-2 A | 318 | 2,181 | 887 | 2,345 | 406 | 694 | 4,650 | 6,831 |
| 98-2 B | 68 | 474 | 24 | 404 | 71 | 27 | 594 | 1,068 |
| 98-2 Collateral | 43 | 296 | | | | 12 | 55 | 351 |
| * | 1,162 | 7,996 | 2,467 | 6,284 | 1,089 | 1,956 | 12,958 | 20,954 |

* Amounts are rounded to the nearest thousand and are provided as an overview of how the planned distributions are allocated to the various series and classes of certificates. The specific distribution to the Collateral Indebtedness Certificates is described below.

The Trustee will distribute the remaining cash in accordance with the above proposal on March 26, 2007. The Trustee will establish a reserve of $350,000 from the funds available for distribution from the Main Collection Account for the payment of any final expenses of the Trust (the "Final Expense Reserve"). The Trustee will distribute any funds remaining in the Final Expense Reserve, after all expenses have been paid, as described below .

The Trustee will continue to hold the Bankruptcy General Unsecured Claim in the Trust and will distribute to the Certificateholders any property relating to that claim, if and when received, net of any expenses.

## DISTRIBUTION RESULTS FOR SERIES 1998-1 COLLATERAL INDEBTEDNESS CERTIFICATE ("1998-1 CIC").

Under the distribution plan described in this Notice, the 1998-1 CIC holder will receive a payment of $44,056.27 on March 26, 2007. The 1998-1 CIC holder receives no distribution from the Collection Account under this distribution plan, and will therefore have no interest in the Final Expense Reserve. The 1998-1 CIC holder has a 3.8% interest in the Bankruptcy General Unsecured Claim, and will receive that percentage of any amounts realized from such claim, net of expenses.

## DISTRIBUTION RESULTS FOR SERIES 1998-2 COLLATERAL INDEBTEDNESS CERTIFICATE ("1998-2 CIC").

Under the distribution plan described in this Notice, the 1998-2 CIC holder will receive a payment of $54,721.05 on March 26, 2007.  The 1998-2 CIC holder has a 0.6% interest in the Final Expense Reserve, and will receive that percentage of the Final Expense Reserve remaining after all expenses of the Master Trust have been paid.  The 1998-2 CIC holder has a 3.7% interest in the Bankruptcy General Unsecured Claim, and will receive that percentage of any amounts realized from such claim, net of expenses.

## CERTIFICATE PURCHASE PROPOSAL

The Trustee has received from Wachovia Bank, N.A., in its individual capacity ("Buyer"), a proposal pursuant to which, immediately following the distribution described herein, Buyer has offered to purchase any and all certificates of the Heilig-Meyers' Trust described above for cash in a non-negotiable amount equal to the Certificateholder's allocable percentage of $5 million, based on the percentage share of the final distribution from the Trust due each class of certificateholder. In addition, the Buyer will agree to transfer to the Certificateholders, if and when received, any receipts from the Trust relating to distributions from the Heilig-Meyers bankruptcy that relate to their certificates and their percentage share of any funds remaining from the $350,000 Final Expense Reserve.

In exchange, the Buyer requires assignment of the certificates and release of all claims against the Buyer and any affiliates of the Buyer, as set forth in Exhibit 1 attached hereto.

The Buyer has indicated that this offer will commence on March 26, 2007 and remain open until April 26, 2007, unless extended by the Buyer.

Under the Trustee's plan of distribution, the Series 1998-1 CIC holder received 0.667% of the March 26, 2007 distribution (net of the distribution to the Buyer).  If the Buyer's offer were accepted, and applying the same percentage to the Buyer's $5 million  purchase offer, the Series 1998-1 CIC holder would receive an additional payment of $33,350 upon Closing of the transaction with the Buyer.

Under the Trustee's plan of distribution, the Series 1998-2 CIC holder received 0.832% of the March 26, 2007 distribution (net of the distribution to the Buyer).  If the Buyer's offer were accepted, and applying the same percentage to the Buyer's $5 million purchase offer,  the Series 1998-1 CIC holder would receive an additional payment of $41,600 upon Closing of the transaction with the Buyer.

As the Buyer is affiliated with the Trustee, the Trustee makes no recommendations with respect to the proposal, and urges each Certificateholder to seek guidance from its own advisors.

The Trustee's distribution plan is not contingent upon acceptance of the Buyer's offer by any or all of the Certificateholders.  Distributions will be made by the Trustee, in accordance

with the distribution plan described herein, to Certificateholders who do not accept the Buyer's offer.

If a Certificateholder has any questions about the Trustee's planned distributions, it should contact Mark Nelson at (704)383-6830 or Mary McCracken at (215)670-3739.

If a Certificateholder has any questions about or wishes to accept the offer described herein, it should contact Jacqueline Molnar at (704)383-9577.

March 5, 2007.

**Exhibit 2**

**SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY**

PRESENT: Hon. _Gammerman_                                PART _27m_
                              _Justice_

Bayerische Hypo- und                    INDEX NO. _601223/01_

                                        MOTION DATE _4/9/01_
          - v -
                                        MOTION SEQ. NO. _001_
1st Union National Bank
                                        MOTION CAL. NO. _____

The following papers, numbered 1 to _____ were read on this motion to/for _____

|                                                          | PAPERS NUMBERED |
|----------------------------------------------------------|-----------------|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | _____ |
| Answering Affidavits — Exhibits _____     | _____ |
| Replying Affidavits _____  | _____ |

**Cross-Motion:**     ☐ Yes     ☐ No

Upon the foregoing papers, it is ordered that this motion _is granted. See record (C. Abelson, C.R.)_

_It is so ordered. Enter._

**MOTION/CASE IS RESPECTFULLY REFERRED** J.S.C.

**JUSTICE**

FILED

APR 26 2001

NEW YORK
COUNTY CLERK'S OFFICE

**DATED:**

Dated: _____ _4/9/01_ _____

Check one:     **FINAL DISPOSITION**     IRA GAMMERMAN  **NON-FINAL DISPOSITION**    J.S.C.

MMMV

1 167.58

MOTION SEQUENCE # 001

*IAS Part*

At the ~~IAS and Motion Term~~ of the
Supreme Court of the State of New York,
County of New York, to be held at the New
York County Courthouse, Supreme Court
Building, 60 Centre Street, New York, New
York on the 13 day of March, 2001

PRESENT:

HON. *IRA GAMMERMAN* , J.S.C.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

BAYERISCHE HYPO- UND VEREINSBANK AG,
NEW YORK BRANCH

                                             Plaintiff,

       - against -

FIRST UNION NATIONAL BANK, as Trustee of
Heilig-Meyers Master Trust, and HEILIG-MEYERS
MASTER TRUST,

                                             Defendants.

Index No. 01- 601223 /01

ORDER TO SHOW CAUSE
~~AND TEMPORARY~~
~~RESTRAINING ORDER~~

#16758

Upon the annexed Complaint of Bayerische Hypo- und Vereinsbank AG, New

York Branch ("HVB"), the affidavit of Mark F. Hirshorn, sworn to March 12 2001, together

with the exhibits annexed thereto, and the memorandum of law submitted herewith, it is hereby

       ORDERED, that Defendants First Union National Bank ("First Union") and

Heilig-Meyers Master Trust (the "Trust") or their attorneys show cause before this Court at ~~the~~

*PART*
~~IAS Motion Part~~, Room 24 Supreme Court Building, 60 Centre Street, New York, New

York on March 22 2001 at 4 /P.m., or as soon thereafter as counsel may be heard, why an order

should not be entered (a) pursuant to CPLR § 2701 directing First Union to pay into Court certain

FILED

APR 26 2001

NEW YORK
COUNTY CLERK'S OFFICE

funds in what is known as the "Collection Account" that First Union is holding as Trustee of the

Trust, the ownership of which funds is in dispute and which funds are the subject of this action

or, in the alternative, directing First Union and the Trust not to disburse any funds in the

Collection Account pending final judgment herein, and (b) pursuant to CPLR § 6311

preliminarily enjoining First Union, including any officer, agent, employee and/or representative

of First Union or the Trust, from transferring, or causing the transfer of, any funds in the

Collection Account out of their possession or control;

1)    AND IT IS FURTHER ORDERED that pending the hearing ~~and determination~~ of

this motion, First Union and the Trust, including any officer, agent, employee and/or

representative of First Union or the Trust, is enjoined from transferring, or causing the transfer

of, any funds in the Collection Account out of their possession or control;

2)    AND IT IS FURTHER ORDERED that this Order shall remain in full force and

effect until such time as this Court specifically orders otherwise;

AND IT IS FURTHER ORDERED that personal service, ~~commission by Federal~~

~~Express or other overnight courier service~~ of a copy of this Order, together with the supporting

papers upon which it is based, and the Summons AND Complaint, on First Union, on or before the 4 day of

March, 2001 be deemed sufficient;

AND IT IS FURTHER ORDERED that opposition papers, if any, to Plaintiff's

motion shall be served at least 25 days before the date of the hearing thereon.

**ORAL ARGUMENT**
**DIRECTED**

ENTER

J.S.C.

J.S.C.

IRA GAMMERMAN

03161.002 #209545v6

FILED

APR 2 6 2001

NEW YORK
COUNTY CLERK'S OFFICE

2

1

2  SUPREME COURT OF THE STATE OF NEW YORK
   COUNTY OF NEW YORK: CIVIL TERM: PART 27
3
   - - - - - - - - - - - - - - - - - - x
4
   BAYERISCHE HYPO-UND VEREINSBANK, AG
5  NEW YORK BRANCH,

6                                    Plaintiff

7              -against.-

8  FIRST UNION NATIONAL TRUST, as Trustees of
   Heilig-Meyers Master Trust, and
9  HEILIG-MEYERS MASTER TRUST

10                                  Defendants

   - - - - - - - - - - - - - - - - - - x
11  Index No.  601223/01

12                     April 19, 2001
                       60  Centre  Street
13                     New York, New York

14
   B E F O R E:   HON. IRA GAMMERMAN, J.S.C
15

16
   A P P E A R A N C E S :
17
   SEWARD & KISSEL, LLP
18  Attorneys for Plaintiff
   One Battery Park Plaza
19  New York, New York
   BY:    MARK J. HYLAND
20         JACOB HOROWITZ, ESQ.

21
   LeBOEUF LAMB GREENE & MAcRAE, LLP
22  Attorneys for Defendant
   125 West 55th Street
23  New York, New York, ESQ.
   BY:    LAWRENCE E. MILLER, ESQ.
24         LOUIS SMITH, ESQ.

25
                       CHARLES L. ABELSON, C.S.R.
                       OFFICIAL COURT REPORTER

Motion

1
2        THE COURT:  This is 16758.  That
3    number should appear on all papers or
4    communications.
5        This is motion by the plaintiff
6    pursuant to 2701 seeking an order
7    directing the defendant as Trustee of a
8    particular trust Heilig-Meyers Master
9    Trust to deposit about $30 million held
10   in trust (I'll refer to that amount as
11   the contested fund) into the Court, or in
12   the alternative an order directing First
13   Union and the Trusts not to disburse the
14   contested funds pending a final judgment
15   herein.
16       That appears to me, much more,
17   assuming I grant the relief much more
18   wiser than depositing the money into
19   court.  When you get into Court it's not
20   too easy get it out.
21       MR. HYLAND:  2701 doesn't --
22       THE COURT:  In any event, the
23   plaintiff seeks an order under 6311 which
24   would enjoin the defendant from
25   transferring or causing the transfer of

1                              Motion

2      the contested funds.

3          It seems to me the same thing, not to

4      disburse it would be the same as an order

5      directing an injunction which would

6      prevent the transfer of the funds.

7          Generally an order to obtain the

8      preliminary injunction, obviously the

9      party assuming it has to establish a

10     likelihood of success on the merits,

11     irreparable injury in the absence of

12     injunction and a balancing of the

13     equities.

14         But obviously those principles have to

15     be applied, but some degree of

16     flexibility in terms of what is the

17     underlying reality of the actual

18     situation is.

19         Here, the issue relates to ownership

20     of this approximately $30 million out of

21     about $82 million that the Trustee is

22     apparently planning to distribute to

23     other entities other than the plaintiff

24     tomorrow.

25         According to plaintiff, unless the

1                           Motion

2       funds are protected (that is contested

3       funds) and the status quo is maintained

4       while it's a justification of competing

5       claims, the plaintiff could possibly be

6       left without a remedy, because the

7       Trustee has stated that it intends to

8       determine by the 20th of April, that's

9       tomorrow, who's entitled to the contested

10      funds.  And that based on various

11      statements it appears that the Trustee

12      intends to pay the contested funds over

13      to an entity known as Class A

14      certificateholders and class B

15      certificateholders.

16          There apparently are three different

17      classes of debt certificate holders that

18      claim entitlement to these funds.  The

19      funds represented payment made by

20      consumers under installment credit sales

21      contracts for the purpose of furniture,

22      of a furniture company call Heilig-Meyers

23      Furniture Company, and those payments

24      form the source of the payment to the

25      holders for debt securities that were

5

1                           Motion

2    issued by the Trust.

3        The plaintiff is a New York State

4    licensed branch of German Bank is Class C

5    certificateholders and claims that it's

6    entitled to those amounts, the $30

7    million that I designated as contested

8    funds.

9        The defendant maintains that another

10   group known as the Class A

11   certificateholders and the Class B

12   certificateholders are entitled to all or

13   at least a portion of those funds.

14       The First Union serves as Trustee

15   pursuant to an amended and restated

16   Master Pooling and servicing agreement

17   which has the date of February 23, 1998,

18   which is an agreement among the Trustees

19   on behalf of the certificateholders of

20   the Trust and another entitlement called

21   MacSaver as transferor and Heilig-Meyers

22   Company as the Service.

23       That Master Agreement was supplemented

24   by another agreement dated February 27

25   1998, and another agreement supplementing

1                    Motion

2      it dated August 27, 1998.  And the

3      supplement was among the transferor

4      Heilig-Meyers Company, as Service, and

5      the Trustee.

6        The trustee is also a party to loan

7      agreements dated February 27, '98 and

8      August 27, '98 relating to Series 1998-1

9      and Series 1998-2, among the Trustee, the

10     Heilig-Meyers Company, the transferor,

11     and a number of investors named in the

12     agreement and the plaintiff.

13       On August 16, of last year

14     Heilig-Meyers Company, Heilig-Meyers

15     Furniture and certain of their affiliates

16     of those two entities filed a voluntary

17     petition seeking relief under Chapter 11

18     of the Bankruptcy Law.

19       The parties agree that filing of the

20     Bankruptcy petition constituted what is

21     referred to as an early amortization

22     agreement under particular sections of

23     the Master Agreement and triggered an

24     early amortization period under the

25     supplements that I referred to

1                          Motion

2      previously.

3          On August 1, of last year

4      approximately two weeks before the

5      petition was filed, the rating agency

6      Standard and Poor's rating services and

7      Moody's downgraded their respective

8      ratings of the Heilig-Meyers Company and

9      it's affiliate, a company called massager

10     Financial Services.

11         This rating agency downgrade

12     constituted, it is claimed, a

13     non-reduction event under another section

14     of the spread account letters.

15         The plaintiff maintains that one of

16     the consequences of the downgrade by the

17     ratings agency was that principal

18     collection from the installment sales

19     contracted to be made in a specified

20     collection account on a daily basis.

21         Plaintiff maintains that this

22     downgrade triggered what referred to as a

23     revolving period during the August

24     collection period.  And pursuant to

25     particular sections of the 1998

1                                Motion

2        supplements, the principal collections

3        that during that period are to be

4        distributed in accordance with the loan

5        agreement.

6            Thus the plaintiff maintains the money

7        was deposited the collection account,

8        rather than collected pursuant to the

9        installment sales contract and retained

10       by the bankruptcy debtor.

11           According to the plaintiff it

12       bargained for this provision and it was

13       for its sole benefit to protect itself as

14       a creditor.

15           According to the Trustee, however the

16       clear and specific provision of the

17       agreement section 4.6 (f) governs the

18       amortization period triggered by the

19       filing of the petition and that pursuant

20       to that section and supplement each

21       distribution date following the

22       commencement of an amortization period,

23       the available principal collection is to

24       be applied first to the Class A Monthly

25       Principal.

1          Motion

2          Pursuant to another session of the

3      supplements it's argued beginning with

4      the distribution date the month following

5      the month in which the amortization

6      period begins, the Class A Monthly

7      Principal is defined as all available

8      principal collections.

9          Pursuant to another section of the

10     1997 supplement, on each distribution

11     date following the commencement of an

12     amortization period, Principal

13     Collections, according to the defendant,

14     are to be applied first to the senior

15     Class Monthly Principals, obviously A and

16     B; and the Trustee thereafter agrees that

17     the disputed collection should be

18     distributed to those certificate holders,

19     and as I indicated previously intends to

20     make that distribution tomorrow.

21         The plaintiffs suggests that the two

22     sections can be reconciled by bifurcating

23     the August collection period.

24         According to the plaintiff the period

25     of August 1st through 15th would be

Motion

considered the revolving period pursuant

to a section 4.6 (e) of the supplement

and August 16th and thereafter would be

considered the amortization period.

I think the plaintiff has shown a

sufficient likelihood of success on the

merits, that Section 4.6 (e) of the '98

supplements applies to the contested

funds.  And it seems to me that if I deny

the relief that the plaintiff seeks, the

plaintiff will suffer substantial, if not

irreparable injury, substantial injury.

It would be an extreme hardship for

me, for the plaintiff, to collect the

monies from the almost 20

certificateholders in the event that the

Trust is deleted by the distribution.

I think the balancing of equities does

favor the granting of the injunction.

The plaintiff is merely seeking to have

relatively small fraction of the Trust's

total income frozen.  The remaining

balance of the Trust's past and future

can be distributed by the Trustee.  It

Motion

believes it can be distributed without any objection.

I don't think there's a substantial inequity caused by an order directing that the Trustee not distribute the $30 million until a determination has been made by me as to who is the rightful beneficiary under the circumstances.

I'm going to grant the relief and direct that no distribution be made of the contested fund.

Now what do we do from here.

Do we need discovery?

MR. MILLER:  So they'll be no disagreement among ourselves with Your Honor, as to the precise amount that will be distributed.

THE COURT:  How much is the amount?

Can't you agree?

MR. HYLAND:  I'm sure we can agree. It's the amount I think the Trustee identified yesterday, and communicating to all the certficateholders in which it states that the contested amount, I

1                              Motion

2        believe, was $30,875,000.

3              MR. MILLER:   That's my belief also.

4              THE COURT:   You accept that amount.

5              MR. HYLAND:   I do.

6              MR. MILLER:   Fine with me too.

7                          *   *   *

8                     C E R T I F I C A T I O N

9

10          CERTIFIED TO BE A TRUE AND ACCURATE
         TRANSCRIPT OF THE ORIGINAL STENOGRAPHIC
11       MINUTES TAKEN OF THIS PROCEEDING.

12                          _____
                            CHARLES L. ABELSON, CSR
13                          OFFICIAL COURT REPORTER

14

15

16

17

18

19

20

21

22

23

24

25

B I L L I N G    S T A T E M E N T

2
                              CHARLES L. ABELSON, CSR
                              Senior Court Reporter
3                             60 Centre Street - Room 420
                              New York, New York   10007
4                             (212) 748-7909

5
                                   April 23, 2001
6

7              TO:    SEWARD & KISSEL, LLP
                      One Battery Park Plaza
8                     New York, New York
                      ATTN.    MARK J. HYLAND, ESQ.
9                     (212)   574-1541

10

11     TITLE OF CASE:   Bayerische  vs. First Union

12     DATE OF PROCEEDINGS:   April 19, 2001

13     TRANSCRIPT FEE:   $ 93.00

14

15

16
       Thank you for your attention to this matter.
17

18
                              CHARLES L. ABELSON, CSR
19                            SENIOR COURT REPORTER

20

21

22

23

24

25

**Exhibit 3**

# SEWARD & KISSEL LLP

ONE BATTERY PARK PLAZA

NEW YORK, NEW YORK 10004

MARK J. HYLAND
PARTNER
(212) 574-1541
hyland@sewkis.com

TELEPHONE: (212) 574-1200
FACSIMILE: (212) 480-8421
WWW.SEWKIS.COM

1200 G STREET, N.W.
WASHINGTON, D.C. 20005
TELEPHONE: (202) 737-8833
FACSIMILE: (202) 737-5184

March 21, 2007

Mr. Mark Nelson
Jacqueline Molnar, Esq.
Wachovia Bank, National Association
As Trustee
123 S. Broad Street
Philadelphia, PA 19109

Re:     **Heilig-Meyers Master Trust Series 1998-1**
        **Heilig-Meyers Master Trust Series 1998-2**

Dear Mr. Nelson and Ms. Molnar:

We represent Bayerische Hypo- und Vereinsbank AG, New York Branch ("HVB"), holder of the Collateral Indebtedness Interest for the Heilig-Meyers Master Trust (the "Trust") Series 1998-1 and 1998-2. Our client is in receipt of the "Notice to Certificateholders – Heilig-Meyers Master Trust" dated March 5, 2007 (the "March 5 Notice"), which it received as holder of the Collateral Indebtedness Interests. We write to put the Trustee on notice that the Trustee's distribution plan described in the March 5 notice would breach the terms of HVB's agreements governing the allocation and distribution of Trust assets. Accordingly, the current distribution plan cannot proceed, and the Trustee would face substantial liability if it made distributions as set forth in the March 5 Notice.

Specifically, the Trustee identifies the Bankruptcy Administrative Claim settlement and the Bankruptcy General Unsecured Claim as relating "to claims that existed and relate back to the day before the Heilig-Meyers [Company] bankruptcy, August 15, 2000," but proposes to distribute those funds as if collected in July 2000. (March 5 Notice at 4). Such a position is irrational and capricious and intended to injure HVB and favor holders of other classes of certificates, in plain violation of the agreements governing the parties' rights.

It is undisputed that on August 1, 2000 a "Cap Increase Event" and a "Non-Reduction Event" occurred under the documents governing the Trust and HVB's Collateral Indebtedness Interest as a result of the long-term senior unsecured debt rating of the Heilig-Meyers Company ["Heilig-Meyers"] no longer being equal to at least Ba3 by Moody's and BB- by Standard & Poor's. As a result, the Spread Account Cap for each Series was automatically set to equal the Collateral Initial Indebtedness Amount for that Series. During the Revolving Period - - and the March 5 Notice expressly concedes that prior to bankruptcy "the Trust operated in a revolving period" - - it is undisputed that on the occurrence of a Cap Increase

Mr. Mark Nelson
Jacqueline Molnar, Esq.
March 21, 2007
Page 2

Event, daily deposits of principal in the Spread Accounts are required under both the Loan Agreements (to which the A Holders are not a party) and the Supplemental Spread Account Letters **negotiated by HVB and for HVB's sole benefit.**

The Spread Accounts thus were required to be funded on the following Distribution Date from Principal Collections (after deduction of certain amounts not relevant here) up to the Spread Account Cap, and the money in the Spread Accounts was ultimately to be used to cover shortfalls in payments to HVB. The amounts collected in August 2000 were not nearly sufficient to fund fully the Spread Accounts. Here, as noted in the March 5 Notice, there will be a distribution with respect to a Revolving Period, and it is undisputed that in such circumstance HVB is entitled (after the occurrence of a Cap Increase Event) to a distribution of Principal Collections to the Spread Account. To end run HVB's rights, the March 5 Notice creates the fiction that all of the funds collected in connection with the Bankruptcy Administrative Claim and the Bankruptcy Unsecured claim were collected before the Cap Increase Event took place - - in effect pretending that the events of August 1-15 never happened. That is inconsistent with the Trust's representation in the March 5 Notice that these claims relate to August 15, 2000, and cannot withstand judicial scrutiny.

The Bankruptcy Administrative Claim and the Bankruptcy General Unsecured Claim fall under the definition of Principal Collections in the governing documents and are conceded by the Trustee to relate to the period when Principal Collections were required to be collected and distributed for the benefit of HVB. As a result, the $1.16 million ascribed to the Bankruptcy Administrative Claim should be distributed to HVB on March 26, 2007 and not to any other holders of Series 1998-1 and 1998-2. Funds received in respect of the Bankruptcy General Unsecured Claim are subject to the very same analysis and treatment. Notably, in the prior litigation concerning this issue, the Court held that HVB had shown a "sufficient likelihood of success on the merits" on a claim virtually identical to the facts presented here to justify the issuance of an injunction against the Trustee. A copy of the Court's decision is enclosed.

We urge the Trustee to make a distribution to HVB in accordance with the governing documents. It proceeds otherwise at its peril.

Very truly yours,

*Mark J. Hyland*

MJH:jz
Enclosure

SK 03161 0002 757969 v3

2

**<u>Exhibit 4</u>**

Wachovia Bank, National Association
As Trustee
123 S. Broad Street
Philadelphia, PA 19109

NOTICE TO CERTIFICATEHOLDERS
HEILIG-MEYERS MASTER TRUST

Class A-1 Variable Funding Certificates, Series 1997-1
Class A-2 Variable Funding Certificates, Series 1997-1
Class A Certificates, Series 1998-1 (423003AA0)
Class B Certificates, Series 1998-1 (423003AB8)
Collateral Indebtedness Interest, Series 1998-1
Class A Certificates, Series 1998-2 (423003AC6)/(U42305AA7)
Class B Certificates, Series 1989-2 (423003AE2)/(U42305AB5)
Collateral Indebtedness Interest, Series 1998-2

# POSTPONEMENT OF MARCH 26, 2007 DISTRIBUTION

Wachovia Bank, N.A., as Trustee (the "Trustee") of the Heilig-Meyers Master Trust (the "Master Trust") recently announced, by notices dated March 5, 2007, its intention to distribute a significant percentage of the cash it presently holds. This distribution was scheduled to occur on March 26, 2007.

On March 21, 2007 the Trustee received an objection to the distribution methodology from the holder of the Collateral Indebtedness Interests for the Series 1998-1 and Series 1998-2 transactions (the "C Holder"). The objection dealt specifically with the Master Trust's treatment of the Bankruptcy Administrative Claim, and the proposed treatment of the Bankruptcy General Unsecured Claim, if and when the Master Trust receives a distribution from the Heilig-Meyers Liquidating Trust. A copy of the objection received by the Trustee is attached to this notice.

The Trustee is assessing the position of the C Holder. The Trustee further invites the assessment and response to the C Holder's position from the remaining holders of interests in the Master Trust.

In response to this objection, the Trustee has determined that it would be prudent to postpone the distribution for a short time. The Trustee will proceed with the distribution and expects to reschedule the

distribution within approximately 10 days of its originally scheduled date, except that the proceeds of the Bankruptcy Administrative Claim (which total approximately $1,162,000) will not be distributed at this time.

Wachovia Bank, National Association, in its individual capacity ("Wachovia"), has indicated that it is prepared to proceed with its offer to purchase the remaining interests in the Master Trust, as described in the notice dated March 5, 2007. The offer to purchase will be open for 30 days from the date the distribution is rescheduled, unless extended by Wachovia.

Upon resolution of the issues raised by the holder of the Collateral Indebtedness Certificates, either by agreement or court determination, Wachovia will agree to pass-through any available proceeds of the disputed amounts, net of expenses, on the same basis provided in the proposed settlement agreement.

The Master Trust will circulate revised distribution notices as soon as it is able to re-calculate the distribution amounts, taking into account its continued retention of the Bankruptcy Administrative Claim.

If the holders of interests in the Master Trust have any questions regarding the status of the distribution, they may direct them to Mark Nelson at (704) 383-6830 or Mary McCracken at (215) 670-3739.

Dated: March 22, 2007          HEILIG-MEYERS MASTER TRUST

                               By:    Wachovia Bank, National Association,
                                      as Trustee

2

# SEWARD & KISSEL LLP

ONE BATTERY PARK PLAZA

NEW YORK, NEW YORK 10004

MARK J. HYLAND
PARTNER
(212) 574-1541
hyland@sewkis.com

TELEPHONE: (212) 574-1200
FACSIMILE: (212) 480-8421
WWW.SEWKIS.COM

1200 G STREET, N.W.
WASHINGTON, D.C. 20005
TELEPHONE: (202) 737-8833
FACSIMILE: (202) 737-5184

March 21, 2007

Mr. Mark Nelson
Jacqueline Molnar, Esq.
Wachovia Bank, National Association
    As Trustee
123 S. Broad Street
Philadelphia, PA 19109

Re:    **Heilig-Meyers Master Trust Series 1998-1**
       **Heilig-Meyers Master Trust Series 1998-2**

Dear Mr. Nelson and Ms. Molnar:

We represent Bayerische Hypo- und Vereinsbank AG, New York Branch ("HVB"), holder of the Collateral Indebtedness Interest for the Heilig-Meyers Master Trust (the "Trust") Series 1998-1 and 1998-2. Our client is in receipt of the "Notice to Certificateholders – Heilig-Meyers Master Trust" dated March 5, 2007 (the "March 5 Notice"), which it received as holder of the Collateral Indebtedness Interests. We write to put the Trustee on notice that the Trustee's distribution plan described in the March 5 notice would breach the terms of HVB's agreements governing the allocation and distribution of Trust assets. Accordingly, the current distribution plan cannot proceed, and the Trustee would face substantial liability if it made distributions as set forth in the March 5 Notice.

Specifically, the Trustee identifies the Bankruptcy Administrative Claim settlement and the Bankruptcy General Unsecured Claim as relating "to claims that existed and relate back to the day before the Heilig-Meyers [Company] bankruptcy, August 15, 2000," but proposes to distribute those funds as if collected in July 2000. (March 5 Notice at 4). Such a position is irrational and capricious and intended to injure HVB and favor holders of other classes of certificates, in plain violation of the agreements governing the parties' rights.

It is undisputed that on August 1, 2000 a "Cap Increase Event" and a "Non-Reduction Event" occurred under the documents governing the Trust and HVB's Collateral Indebtedness Interest as a result of the long-term senior unsecured debt rating of the Heilig-Meyers Company ["Heilig-Meyers"] no longer being equal to at least Ba3 by Moody's and BB- by Standard & Poor's. As a result, the Spread Account Cap for each Series was automatically set to equal the Collateral Initial Indebtedness Amount for that Series. During the Revolving Period – – and the March 5 Notice expressly concedes that prior to bankruptcy "the Trust operated in a revolving period" – – it is undisputed that on the occurrence of a Cap Increase

Mr. Mark Nelson
Jacqueline Molnar, Esq.
March 21, 2007
Page 2

Event, daily deposits of principal in the Spread Accounts are required under both the Loan
Agreements (to which the A Holders are not a party) and the Supplemental Spread Account
Letters negotiated by HVB and for HVB's sole benefit.

 The Spread Accounts thus were required to be funded on the following
Distribution Date from Principal Collections (after deduction of certain amounts not relevant
here) up to the Spread Account Cap, and the money in the Spread Accounts was ultimately to be
used to cover shortfalls in payments to HVB. The amounts collected in August 2000 were not
nearly sufficient to fund fully the Spread Accounts. Here, as noted in the March 5 Notice, there
will be a distribution with respect to a Revolving Period, and it is undisputed that in such
circumstance HVB is entitled (after the occurrence of a Cap Increase Event) to a distribution of
Principal Collections to the Spread Account. To end run HVB's rights, the March 5 Notice
creates the fiction that all of the funds collected in connection with the Bankruptcy
Administrative Claim and the Bankruptcy Unsecured claim were collected before the Cap
Increase Event took place - - in effect pretending that the events of August 1-15 never happened.
That is inconsistent with the Trust's representation in the March 5 Notice that these claims relate
to August 15, 2000, and cannot withstand judicial scrutiny.

 The Bankruptcy Administrative Claim and the Bankruptcy General Unsecured
Claim fall under the definition of Principal Collections in the governing documents and are
conceded by the Trustee to relate to the period when Principal Collections were required to be
collected and distributed for the benefit of HVB. As a result, the $1.16 million ascribed to the
Bankruptcy Administrative Claim should be distributed to HVB on March 26, 2007 and not to
any other holders of Series 1998-1 and 1998-2. Funds received in respect of the Bankruptcy
General Unsecured Claim are subject to the very same analysis and treatment. Notably, in the
prior litigation concerning this issue, the Court held that HVB had shown a "sufficient likelihood
of success on the merits" on a claim virtually identical to the facts presented here to justify the
issuance of an injunction against the Trustee. A copy of the Court's decision is enclosed.

 We urge the Trustee to make a distribution to HVB in accordance with the
governing documents. It proceeds otherwise at its peril.

 Very truly yours,

 *Mark J. Hyland*

MJH:jz
Enclosure

SK 03161 0002 757969 v3

 2

**<u>Exhibit 2</u>**

© 1990 BY JULIUS BLUMBERG, INC.,
PUBLISHER, NYC 10013

*Editor's note: prepare 3 copies, mail 2 to defendant (no carbon required).*

Index No.  07-601843

BAYERISCHE HYPO-UND VEREINSBANK AG,
NEW YORK BRANCH,

Plaintiff(s)

against

WACHOVIA BANK, N.A., f/k/a FIRST UNION
NATIONAL BANK, as Trustee of HEILIG-
MEYERS MASTER TRUST,

Defendant(s)

**Statement of Service by Mail and
Acknowledgment of Receipt by Mail of
Summons and Complaint or
Summons and Notice or
Notice of Petition and Petition**

## A. Statement of Service By Mail

To  Wachovia N.A., c/o Don Tucker
301 South College St., Suite 4000
One Wachovia Center
Charlotte, NC 28288-0013

Insert the name and address of the person or entity to be served

The enclosed *summons and complaint*, or XXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX(strike out inapplicable terms) are served pursuant to Section 312-a of the Civil Practice Law and Rules.

To avoid being charged with the expense of service upon you, you must sign, date and complete the acknowledgement part of this form and mail or deliver one copy of the completed form to the sender within thirty (30) days from the date you receive it. You should keep a copy for your records or your attorney. If you wish to consult an attorney, you should do so as soon as possible before the thirty (30) days expire.

If you do not complete and return the form to the sender within thirty (30) days, you (or the party on whose behalf you are being served) will be required to pay expenses incurred in

Seward & Kissel LLP
One Battery Park Plaza
New York, NY  10004

(Address)

serving the summons and complaint, or summons and notice, or notice of petition and petition in any other manner permitted by law, and the cost of such service as permitted by law will be entered as a judgment against you.

If you have received a complaint or petition with this statement, the return of this statement and acknowledgment does not relieve you of the necessity to answer the complaint or petition. The time to answer expires twenty (20) days after the day you mail or deliver this form to the sender. If you wish to consult an attorney, you should do so as soon as possible before the twenty (20) days expire.

If you are served on behalf of a corporation, unincorporated association, partnership or other entity, you must indicate under your signature your relationship to the entity. If you are served on behalf of another person and you are authorized to receive process, you must indicate under your signature your authority. **It is a crime to forge a signature or to make a false entry on this statement or on the acknowledgement.**

(Signature)

Mark J. Hyland, Esq.

(Print name)

## B. Acknowledgement of Receipt of Summons and Complaint or Summons and Notice or Notice of Petition and Petition

I received a *summons and complaint*, XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX in the above-captioned matter at ..........................................................................................................................

insert address

PLEASE CHECK ONE OF THE FOLLOWING; IF 2 IS CHECKED, COMPLETE AS INDICATED:

☑ 1. I am not in military service.
☐ 2. I am in military service, and my rank, serial number and branch of service are as follows:
Rank............................. Serial Number ........................................ Branch of Service ...............................

TO BE COMPLETED REGARDLESS OF MILITARY STATUS.

Date  June 18, 2007

(Date this Acknowledgement is executed)

Signature

DONALD H. TUCKER, JR.

Print name

I affirm the above as true under penalty of perjury.

WACHOVIA BANK, N.A.

Name of Defendant for which acting

ATTORNEY

Position with Defendant for which acting
(i.e., officer, attorney, etc.)

PLEASE COMPLETE ALL BLANKS INCLUDING DATES